**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                   :
PAULA GREEN,                       :
                                   :    CIVIL ACTION NO. 10-244 (MLC)
        Plaintiff,                 :
                                   :    MEMORANDUM OPINION
        v.                         :
                                   :
EQUIFAX INFORMATION, LLC,          :
                                   :
        Defendant.                 :
_____    :
```

**COOPER, District Judge**

Plaintiff, Paula Green, brings this action against
defendant, Equifax Information Services, LLC, a subsidiary of
Equifax, Inc. (collectively "Defendant" or "Equifax"), alleging
denial of severance benefits and breach of fiduciary duty under
the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.
§ ("Section") 1132(a), and breach of contract with respect to the
Equifax, Inc. Severance Plan (the "Plan").  (Dkt. entry no. 1,
Compl.)[1]  Defendant now moves for summary judgment pursuant to
Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry no.
22).  Plaintiff opposes the motion.  (Dkt. entry no. 24, Pl. Br.)

The Court heard oral argument on the motion on March 28,
2011.  The parties participated in a telephonic conference with
the Court on June 2, 2011, to discuss the issue of the contents

_____

[1] Equifax Information Services, LLC, was improperly named in
the Complaint as Equifax Information, LLC.  (Dkt. entry no. 22,
Def. Stmt. Facts at 1 n.1.)

of the administrative record to be considered in the Court's review of this case.  (Dkt. entry no. 32.)  The Court accepts the administrative record filed by Defendant for purposes of deciding the current motion.  (Dkt. entry no. 32, Admin. R. ("A.R.").)  For the reasons stated herein, the Court will grant Defendant's motion for summary judgment.

### BACKGROUND

The facts underlying this case are, for the most part, not in dispute between the parties.  (See Def. Stmt. Facts; dkt. entry no. 24, Pl. Reply to Def. Stmt. Facts (admitting each statement put forth by Defendant).)

### I.   Plaintiff's Employment and Termination

Plaintiff was employed by Equifax as a Regional Account Manager having an adjusted beginning service date of August 18, 1989.  See infra at 11 n.2.  She was notified on January 14, 2008, that her employment would be terminated effective January 21, 2008.  (Dkt. entry no. 22, Cassidy Aff. at ¶ 7 & Ex. 3, 1-16-08 Cassidy Email at 3; A.R. at 57-59.)  Plaintiff thus had worked for Equifax for 18 years at the time of her termination.  (Pl. Br. at 2.)

Plaintiff's immediate supervisor during the time leading up to her termination was Donna Cassidy, Director of Regional Sales.  (Cassidy Aff. at ¶¶ 1-2.)  According to Cassidy, Plaintiff's termination came about in connection with Equifax's loss of the

business of Dominion, a utility company.  (Def. Br. at 2 &
Cassidy Aff. at ¶ 3.)  The Dominion account had been assigned to
Plaintiff in April 2007.  (Pl. Br. at 2 & Ex. A, Green Cert. at ¶
4.)  Plaintiff made several attempts to contact the Dominion
representative, David Holt, but was unsuccessful in setting up a
meeting with him until December 6, 2007.  (Green Cert. at ¶¶ 5-6.
& Pl. Br., Ex. E, 1-7-08 Green Email to Cassidy (attaching emails
showing that Plaintiff contacted Holt on July 9, 2007, and
September 17, 2007, prior to scheduling December 6, 2007
meeting); A.R. at 42-53.)  On December 6, 2007, Holt revealed to
Green and Cassidy that Dominion had finalized a contract with
Equifax's competitor, Experian, and thus Dominion would no longer
be doing business with Equifax.  (Green Cert. at ¶¶ 6-8.)  Holt
further explained that he had delayed meeting with Plaintiff in
the preceding months because Dominion had been working out the
details of its contract with Experian, and Dominion policy
precluded him from disclosing to Equifax that it was involved in
negotiations with Experian.  (Id. at ¶ 8.)

Cassidy took the view that Green's "lack of face-to-face
contact with an important client like Dominion was not . . .
acceptable" and that the loss might have been avoided with
personal contact so that Equifax could have discovered the
client's product needs before losing the account.  (Cassidy Aff.
at ¶ 3 & Ex. 3, 1-16-08 Cassidy Email; A.R. at 57-59.)  On

3

December 17, 2008, Cassidy spoke with Plaintiff by phone and indicated that Cassidy thought the loss of the Dominion account should be attributed to Plaintiff's failure to meet with the client for the seven months the account had been assigned to her. (1-16-08 Cassidy Email at 1; Green Cert. at ¶ 10; Pl. Br. at 3-4.)  Plaintiff responded that (1) Holt had made clear that he had avoided meeting with her until the Experian contract was in place, (2) Equifax did not have the competitive technology in place that could have been offered to the client to avoid the loss, and (3) any representation to the contrary would be inaccurate.  (Green Cert. at ¶ 10.)  Plaintiff's objections notwithstanding, Cassidy directed Plaintiff to prepare a loss report detailing the circumstances of the loss of the Dominion account, which Plaintiff sent to Cassidy the following day. (Green Cert. at ¶ 10 & Ex. E, Loss Report.)

Cassidy contacted Plaintiff on January 7, 2008, to advise that corrective action in the form of a Performance Improvement Plan ("PIP") would likely be taken against Plaintiff due to Plaintiff's failure to adequately support Equifax's relationship with Dominion during the time the account had been assigned to her.  (1-16-08 Cassidy Email at 2; Green Cert. at ¶ 11; A.R. at 39-41 (unsigned PIP dated 1-8-08).)  Plaintiff thereafter contacted Holt and "bluntly told him that Ms. Cassidy was attributing" the loss of the Dominion account to Plaintiff, and

4

"asked him if there was anything that [Plaintiff] or the company could have done differently to maintain his business." (Green Cert. at ¶ 12.) Plaintiff asked Holt to explain the sequence of events leading to the loss in writing, which Holt sent to Cassidy on January 8, 2008. (Id. & Ex. G, 1-8-08 Holt Email to Cassidy (describing "the timeline . . . of [Dominion's] decision to move from Equifax to Experian"); A.R. at 55.) Holt's email to Cassidy states that by the time Plaintiff had been assigned to the Dominion account, Dominion's decision to contract with Experian had already been made, and at the time of that decision, Equifax did not have the type of product sought by Dominion available. (1-8-08 Holt Email at 2.) Holt's email states that although Plaintiff "had been trying to come visit" Dominion again after a summer 2007 visit, "work load coupled with imminent completion of the contract [with Experian] prompted us to delay the visit a couple of times." (Id.)

Cassidy found it "odd" that Holt's email specifically referred to Plaintiff's attempts to come visit, because she "had never shared a concern of the lack of client visits or support with the client, only with Paula." (1-16-08 Cassidy Email at 2.) She therefore forwarded (1) Plaintiff's January 7, 2008 email to Cassidy documenting Plaintiff's attempts to contact Dominion, and (2) Holt's January 8, 2008 email to Cassidy, to an Equifax Human Resources ("HR") employee, Kimberlyn Daniels, expressing her

5

"grave concern" that Plaintiff had shared internal information concerning the potential corrective action being taken against her, unnecessarily involving the client and potentially exposing Equifax to its competitor, Experian, by virtue of the new relationship between Dominion and Experian.  (Id.)  Daniels advised Cassidy to contact Plaintiff to determine what information, if any, Plaintiff had shared with Holt regarding the potential corrective action being taken as a result of insufficient client support.  (Id.)

Cassidy called Plaintiff on January 11, 2008, to ask whether Plaintiff had asked Holt to send the January 8, 2008 email, and whether she had discussed the internal corrective action she was facing.  (Green Cert. at ¶ 13; 1-16-08 Cassidy Email at 2.)  Plaintiff admitted that she had contacted Holt on January 7, 2008, and "may have said something" along the lines of, "it's very difficult when a company loses an account like Dominion."  (Id.)  While Plaintiff states that she denied revealing to Holt that she was facing corrective action, Cassidy asserts that Plaintiff stated to her that she could not remember whether she had said anything to Holt specifically about on-site support.  (Id.)  Cassidy then followed up with Daniels in HR to discuss her January 11, 2008 conversation with Plaintiff.  (1-16-08 Cassidy Email at 2.)  Daniels consulted with the legal department and advised Cassidy that Plaintiff's actions were grounds for immediate termination as a "flagrant violation of the Regional

6

Account Manager role," specifically, "exercising extremely poor judgment in sharing company confidential information with our client regarding corrective action being taken against" her. (Id.)

Cassidy met with Plaintiff on January 14, 2008, to advise that Plaintiff's employment was being terminated.  (1-16-08 Cassidy Email at 3; Green Cert. at ¶ 14.)  Cassidy and Plaintiff differ somewhat in their characterizations of how Cassidy communicated this decision to Plaintiff.  Cassidy's documentation indicates that she told Plaintiff,

> [t]he reason for termination is you exercised extremely poor judgment with our client – Dominion – in sharing company confidential information with our client regarding internal action being taken in your role as Regional Account Manager.  Thus creating exposure to the Company.  This is a flagrant violation of the Regional Account Manager Role. . . . This is not because of the loss of the Dominion account but because as a result of the loss it was discovered by feedback from you, that you had not been to account for 7 months, you were unaware that the customer was at risk of leaving and the appropriate client relationships were not in place. Once this was discovered and internal action was being taken against you, you contacted the customer and shared confidential information with the customer which resulted in extreme exposure for Equifax this is why you are being terminated.

(1-16-08 Cassidy Email at 3.)  Plaintiff's certification states that Cassidy told her that she "was being terminated for 'embarrassing' Equifax by sharing sensitive and confidential information that resulted in 'extreme exposure' to the company

7

. . . [in] 'flagrant violation' of the Regional Account Manager role." (Green Cert. at ¶ 14.)  Plaintiff further asserts that she "was specifically advised that [she] was being fired for 'cause.'"  (Id.)

Cassidy told Plaintiff that Equifax had decided to extend her effective termination date to January 21, 2008, such that Plaintiff would turn 55 and therefore be eligible for certain retirement benefits.  (1-16-08 Cassidy Email at 3.)  Cassidy further advised that Plaintiff would receive a detailed severance package the following day, but that Plaintiff could expect to receive 4 weeks of vacation pay, and "as a result of completing 18 years of service would be receiving severance for 12 weeks in the amount of $30,117."  (Id.)  Plaintiff was offered a severance package including 12 weeks of severance pay, but she declined to sign the General Release.  (Pl. Br. at 5 & Ex. I, Severance Agreement and General Release (signed by Donna Cassidy on January 14, 2008, and unsigned by Plaintiff, stating that Equifax would provide Plaintiff 12 weeks of severance payments); A.R. at 17-21.)

## II.  The Equifax Severance Plan

The Plan is governed by ERISA and distinguishes between exempt and non-exempt employees under the Fair Labor Standards Act.  (Dkt. entry no. 22, Myers Aff. at ¶ 3 & Ex. 2, January 2008 Summary Plan Descriptions ("SPD") at 1, 7; see generally A.R. at

8

22-35.)  Plaintiff was covered by the Plan as an exempt employee.
(Myers Aff. at ¶ 5.)  Equifax, Inc. serves as both the Plan
Sponsor and Claims Administrator for the Plan.  (Id. at ¶ 6; A.R.
at 83, 101.)

The Plan provides that an employee "must meet one of the
following conditions to be offered severance pay":

- your position is eliminated (unless you are offered
replacement employment);

- your office is relocated to a place requiring a commute
more than 35 miles longer than your prior commute; or

- you are terminated due to inability or failure to meet
job expectations.

(SPD at 1; A.R. at 24.)  Furthermore, an employee "will be
granted severance pay only if you sign a General Release . . .
within 21 calendar days" of receiving the release.  (SPD at 1-2;
A.R. at 24.)

An exempt employee terminated due to job elimination or
office relocation is entitled to a severance benefit of 4 weeks
for any portion of the employee's first year of service, plus an
additional 2 weeks for each year of completed service, up to 52
weeks.  (SPD at 2; A.R. at 25.)  An exempt employee terminated
due to inability or failure to meet job expectations who has 10
or more years of service is entitled to 12 weeks of severance.
(SPD at 3; A.R. at 25.)  Severance pay is calculated for "highly
leveraged" employees, which the parties do not dispute describes

the Plaintiff, at a rate of 125% of base pay.  (SPD at 3; A.R. at 26.)

The Plan provides that severance benefits will not be paid for several reasons, including where the employee is "discharged for cause (e.g. violation of attendance policies; insubordination; dishonesty; drug or alcohol use or possession at work; improper conduct; violation of fundamental procedures or conflict of interest)."  (SPD at 4; A.R. at 27.)

The Plan vests the Claims Administrator, which for the severance plan is the same as the Plan Administrator, with "discretionary authority to interpret Plan provisions, construe unclear terms and otherwise make all decisions and determinations, including factual determinations."  (Myers Aff. at ¶ 10 & Ex. 3, 2007 Administrative Information SPD; id., Ex. 4, May 2008 Administrative Information SPD.)  A terminated employee seeking severance benefits must "file a written claim with the Plan or Claims Administrator," referred to in the June 2009 Administrative Information SPD as the "Administrator," within two years of the employee's termination date.  (Myers Aff., Ex. 6, June 2009 Administrative Information SPD at 19.)  The Plan provides that the Administrator must notify the employee of its decision within 90 days of receiving the claim, at which point, if the claim is denied in whole or part, the employee may file a written appeal within 60 days.  (Id.)

10

### III. Plaintiff's Claim for Severance Benefits

Plaintiff filed a written claim for severance benefits on August 25, 2009.  (Myers Aff. at ¶ 12 & Ex. 7, 8-25-09 Claim; Pl. Br., Ex. J, 8-25-09 Claim (same document); A.R. at 63.) Plaintiff asserted that she was entitled to 42 weeks of severance pay, due to her length of service of 20 years.[2]  The 8-25-09 Claim asserts that Plaintiff "was told that [she] was being terminated for 'cause' and offered only 12 weeks of severance. In fact, there was no 'cause.'"  (8-25-09 Claim at 1.)

Adolyn Myers, Director of Benefits Administration for Equifax, responded to Plaintiff on October 13, 2009, to advise her of the Administrator's determination with respect to her claim.  (Myers Aff. at ¶ 1 & Ex. 8, 10-13-09 Claim Determination; Pl. Br., Ex. O (same document); A.R. at 162-63.)  The Administrator's denial of Plaintiff's claim for 42 weeks of severance benefits determined that Plaintiff did not meet the eligibility criteria for either job elimination or office relocation, which would have entitled her, as an employee with 18 years of service, to 40 weeks of severance.  (10-13-09 Claim Determination at 1.)  The Administrator further found that

---

[2] Plaintiff's claim for 42 weeks of severance pay apparently does not take into account a break in service from August 6, 1999 to October 2, 2000, that resulted in her adjusted service date of August 18, 1989.  She does not dispute at this stage in the proceedings that she had 18 years of service with Equifax at the time of her termination.  (See Pl. Br. at 5; A.R. at 5.)

Plaintiff had been offered 12 weeks of severance pay in accordance with the terms of the Plan and provided a General Release, but never signed or returned the General Release. (Id.) Thus, the Administrator found that the 12 weeks of severance pay that was offered to Plaintiff was not payable. (Id.)

The October 13, 2009 decision states that the Plan Administrator "considered the language in the Severance Plan, the written information [Plaintiff] provided with [her] claim, and internal documentation." (Id. at 2.) Plaintiff filed a written appeal of her claim denial on October 26, 2009. (Myers Aff. at Ex. 9, 10-26-09 Appeal; A.R. at 132-33.) In her appeal, Plaintiff argued that: (1) she was not dismissed for cause; (2) there were no grounds to support her alleged failure to meet job expectations; and (3) she believed job elimination to be the "very real and unstated cause" for her termination. (Id. (10-20-09 Appeal Request); Pl. Br., Ex. R (same document); A.R. at 132.)

Myers contacted Plaintiff on December 23, 2009, to inform her that the "Equifax Appeals Committee" had met on December 15, 2009, to review her appeal, denied the appeal, and upheld the original denial made October 13, 2009. (Myers Aff. at Ex. 10, 12-23-09 Appeal Decision; Pl. Br., Ex. Q (same document); A.R. at 155-56.) The December 23, 2009 appeal decision states that Plaintiff's claim was denied because

> the reason for your termination was not related to a job
> elimination or office relocation. Therefore, you were

not eligible for 42 weeks of severance pay under the
Severance Plan.  However, you were offered 12 weeks of
severance pay in accordance with the terms of the
Severance Plan and you were provided a General Release on
January 17, 2008.  You failed to execute and return the
General Release, which is a precondition to receiving
your severance pay and any other benefits under the
Severance Plan.  Because you did not execute and return
the General Release you are not eligible for any amount
of severance pay from the Severance Plan.

(12-23-09 Appeal Decision at 1.)  The appeal decision further
advised Plaintiff of her right to bring an action under Section
502(a) of ERISA if she wished to further pursue her claim.  (Id.
at 2.)

     Plaintiff now argues, as she did in her appeal of the Plan
Administrator's denial of benefits, that the real cause for her
termination was elimination of her position.[3]  Her basis for this
argument is that no one has been hired in her specific position
as her replacement.  (Pl. Br. at 8 & 10-20-09 Appeal Request.)
Plaintiff states that while Equifax filled a Regional Account
Manager position on the West Coast after her termination, that
position was "open and posted long before [she] was terminated
and [her] position eliminated."  (Id.)  Equifax has taken the
position that Plaintiff's position was not eliminated, but rather
Cassidy made a strategic determination to immediately fill the
open West Coast position and distribute Plaintiff's former

---

[3] Plaintiff does not suggest that office relocation was at
issue in her termination.  (See dkt. entry no. 22, Strand Aff.,
Ex. 1, Response to Def.'s Request for Admissions at ¶¶ 2-3.)

accounts among the West Coast hiree and other account managers. (Cassidy Aff. at ¶¶ 9-11 & Ex. 4, 10-27-09 Cassidy Email to Myers; A.R. at 136-37.)

Cassidy's email of October 27, 2009, to Adolyn Myers discusses Plaintiff's appeal of the October 13, 2009 benefit denial decision.  (Id.)  It was sent in response to an email from Myers stating, "[u]nfortunately, we have heard from Paula again after her first level of appeal was denied for severance pay. . . . Can you assist with her comments regarding her job elimination claims?"  (Id. at 2.)  Cassidy's email states, "No worries.  It is unfortunate her claim is job elimination.  That is clearly not the case. . . . Paula was terminated for cause."  (Id. at 1.)

Cassidy's email to Myers also addresses Plaintiff's claim that the reason for Plaintiff's termination was job elimination. (Id.)  Cassidy explains that Plaintiff "was terminated for cause, [and] upon her termination, I temporarily assigned her accounts across my team."  (Id.)  Cassidy then "immediately took action to fill an Account Managers [sic] position, I determined strategically the best possible territory to fill immediately would be the west coast, this was an open position and as such refutes the claim of job elimination."  (Id. at 2.)  Kirby Romine was hired in April 2008 and located on the West Coast.  (Id.) Cassidy's email states that once he was trained and up to speed, she "assessed the need to replace Paula's position," and determined that "given the talent and skill set of the team," she

14

did not need to immediately hire someone to fill Plaintiff's position on the East Coast.  (Id.)

Plaintiff argues that Kirby Romine cannot be considered her replacement, because the West Coast position he was hired to fill had been open for a period of six months prior to Plaintiff's termination.  (Pl. Br. at 11; Green Cert. at ¶¶ 15-17.)  The Plaintiff concedes that six months after Romine's hire, he was assigned 12 of the Plaintiff's 23 former accounts.  (Id.)  Plaintiff's remaining former accounts continued to be divided among the remaining account managers.  (Id.)

## DISCUSSION

## I.   Legal Standards

### A.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

15

**B.   Applicable Standard of Review**

ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  The Court should review a denial of ERISA plan benefits under a de novo standard of review, unless the benefit plan gives the administrator or fiduciary of the plan discretionary authority to determine benefits eligibility or construe the plan's terms.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan confers such discretion, the Court should apply a deferential abuse of discretion standard.  Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525, 526 n.2 (3d Cir. 2009).[4]  Under this standard, the Court must uphold the plan administrator's decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Id. at 527 (citation omitted).  "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants in

---

[4] The abuse of discretion standard is essentially the same as the arbitrary and capricious standard in the ERISA context. See Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 n.2 (3d Cir. 2011); Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993).  Under either articulation of the applicable standard, the question for the Court is whether the plan administrator's interpretation of the ERISA plan is reasonable. McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan, 340 F.3d 139, 142-43 & n.2 (3d Cir. 2003).

determining eligibility for plan benefits." Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (quotation and citation omitted).

Where the plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," a conflict of interest exists, and "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." Glenn v. Met. Life Ins. Co., 554 U.S. 105, 108 (2008).

The plan administrator here is Equifax, Inc. Under the terms of the Plan, it is vested with discretionary authority to interpret the provisions of the Plan, but also pays benefits. See supra at 9-10. Accordingly, we review Defendant's determination that Plaintiff is not entitled to 40 weeks of severance benefits for an abuse of discretion, taking into consideration the conflict of interest inherent in the fact that Equifax both funds and administers the Plan as one of the factors to be weighed in our review. See Schwing, 562 F.3d at 526.[5]

---

[5] Equifax argues that to the extent the conflict of interest should be considered at all, given that Plaintiff's claim is de minimis in comparison to Defendant's annual revenue, the evidence shows that Equifax was not biased or conflicted insofar as it "decided on its own accord to set Green's effective termination date on January 21, 2008, as opposed to January 14, 2008, so that she would be eligible for certain retirement benefits based on the later date." (Def. Br. at 15-16.)

## II.  Legal Standards Applied Here

We find that, even taking into account the possible conflict of interest, Defendant did not abuse its discretion in determining that Plaintiff had been properly offered 12 weeks of severance pay, was not entitled to payment of such benefits due to her failure to execute the General Release, and was not entitled to 40 weeks of severance benefits under the clear and unambiguous terms of the Plan and the circumstances of her termination.

The record shows that Plaintiff's termination came about as a direct result of her handling of Equifax's loss of the Dominion account, specifically, reaching out to the client after she was faced with internal corrective action.  Although Plaintiff disagrees with the fairness of this outcome, she has conceded the factual predicate for the determination that she failed to meet job expectations insofar as she "may have said something" to Holt about "difficult[ies]" inherent in losing "an account like Dominion."  (Green Cert. at ¶ 13.)  Based on the evidence in the record showing that Plaintiff's supervisor, with the input of Equifax's legal and HR departments, determined that this constituted a failure or inability to meet job expectations, the Plan Administrator reasonably found that Plaintiff would have been entitled to 12 weeks of severance benefits under the terms of the Plan but for her failure to execute the General Release.

18

Plaintiff's contentions that Cassidy told Plaintiff that she was being terminated for cause are immaterial.  Had Plaintiff been terminated for "cause" as defined in the Plan, she would not have been offered any severance, as opposed to the 12 weeks she was offered.  The question of whether Plaintiff was terminated for "cause," in light of the language of the Plan, has no bearing in any event on the issue presented in Plaintiff's ERISA claim for benefits:  whether she was terminated due to job elimination. Moreover, any reference by Cassidy to Plaintiff's termination being for "cause" appears colloquial and not to have been either intended or effective as an interpretation of the Plan itself. The Plan Administrator's benefit denial decision had nothing to do with whether Plaintiff was terminated for "cause" under the terms of the Plan.

We further find that Defendant reasonably found that Plaintiff was not terminated due to job elimination.  Although Plaintiff has presented evidence that her position ultimately went unfilled, there is not a scintilla of evidence in the record that permanent elimination of her position was contemplated by anyone at Equifax at the time of Plaintiff's termination, such that it could have been the cause therefor.  Rather, the timing of her termination strongly suggests that it was motivated solely by Plaintiff's handling of the loss of the Dominion account.  The paperwork contemporaneously documenting Plaintiff's separation from Equifax states, "Involuntary - Unsatisfactory Performance

termination." (A.R. at 1.)  This evidence supports Defendant's findings, both in its initial claim determination and the disposition of the appeal, that Plaintiff was offered 12 weeks of severance, which under the Plan was available to an employee, such as Plaintiff, having more than 10 years of service and being terminated for an inability or failure to meet job expectations. Plaintiff's after-the-fact argument pertaining to job elimination does not overcome the substantial evidence before the Plan Administrator that she was terminated as a result of her contacting the Dominion representative after she was faced with internal corrective action.  Indeed, when Plaintiff submitted her initial claim for benefits, she did not claim that she had been terminated due to job elimination, but rather focused "on the grounds that there was no justifiable 'cause' for terminating [her] employment with Equifax." (A.R. at 114.)  She raised the issue of job elimination for the first time in her appeal of the Plan Administrator's denial.  (A.R. at 132-33.)

       We therefore conclude that Equifax, as the Plan Administrator, did not abuse its discretion in denying Plaintiff's claim for severance benefits.  There is substantial evidence supporting the Plan Administrator's determination that Plaintiff was not terminated due to job elimination and therefore ineligible for 40 weeks of severance pay.  (A.R. at 141-56.)  We further find no evidence of structural irregularity or conflict

of interest that could lead the Court to conclude Defendant abused its discretion in administering the Plan.  Judgment will be entered in favor of Defendant on Plaintiff's claim under ERISA seeking 40 weeks of severance pay.

**III. Breach of Fiduciary Duty and Breach of Contract Claims**

In light of the Court's finding that Defendant's interpretation and administration of the Plan was reasonable with respect to Plaintiff's claim for severance benefits, she cannot succeed on her claims for breach of fiduciary duty under Section 502(a)(3) of ERISA or for breach of contract, which are predicated on the same facts and seek the same relief.  See Eichorn v. AT&T Corp., 484 F.3d 644, 655 (3d Cir. 2007).  The Court will grant judgment in favor of Defendant on these claims.

**CONCLUSION**

For the reasons stated supra, the Court will grant Defendant's motion for summary judgment.  The Court will issue an appropriate order and judgment.

  s/ Mary L. Cooper

**MARY L. COOPER**
United States District Judge

Dated: September 30, 2011

21